# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Latisha Stewart ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 16 CV 50243 |
| ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This is a Social Security disability benefits appeal. Plaintiff Latisha Stewart filed an application for supplemental security income in March 2012. She was 35 years old at the time, and alleged that she became disabled over five years earlier, beginning on December 17, 2006.[2] This date was when plaintiff suffered a stroke and was hospitalized.

Two hearings were held before the administrative law judge ("ALJ"). The first one was in June 2014, and plaintiff was the primary witness. She testified that she suffered from severe fatigue. Although fatigue was the chief complaint, she also claimed to suffer from "severe headaches all the time," "body aches all the time," diarrhea, upset stomach, swollen ankles, thinning hair, and cold fingertips. R. 95-99. Plaintiff also claimed to have lupus. She testified that she was always sleepy and tired and could not do any activity longer than 20 minutes. She felt as if an elephant were sitting on her body, and also stated that, although only 38 years old, she felt "like [] an old lady at times." R. 98. She had four children under 18 living with her, and her

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] This was plaintiff's fifth application. R. 19. The first four were apparently denied at the administrative level. As the Government points out, supplemental security income is not payable prior to the month in which the application was filed, meaning plaintiff now could only be eligible for benefits starting in April 2012.

1

mother and neighbors helped take care of them. In 2011 and 2012, she worked out of her home micro-braiding hair, earning $7,976 in self-reported income in 2011 and $12,502 in 2012. R. 21. She also volunteered at a thrift store in 2012 because she was required to do so to receive public aid. She claimed that her lupus eventually made this job too difficult and quit.

At this first hearing, and now in her briefs to this Court, plaintiff repeatedly identified her stroke in December 2006 as being the point when, in plaintiff's words, her life "went downhill." R. 95. However, at other points, she suggested that many of symptoms existed before the stroke. *Id.* ("before the stroke took place, I was always tired"). She testified that she believed she had "severe lupus." R. 93.[3] In sum, her testimony suggests two possible causes—a stroke and lupus—for her various symptoms.

A few months after the first hearing, the ALJ held a second hearing to obtain testimony from a medical expert, Dr. Ashok Jilhewar. Dr. Jilhewar began his testimony by noting two deficiencies in the record. First, he found "no evidence of active systemic lupus erythematosus." R. 50. He noted that plaintiff had been referred to a rheumatologist on June 4, 2014, but that there was no evidence she followed up on the referral. *Id.* Second, he found no "documentation of chronic daily headache[s]." *Id.* The ALJ then asked about the 2006 stroke and whether there had been any "clinical residuals" since that time. R. 51. This led to a long answer from Dr. Jilhewar in which he reviewed various technical medical tests and statements in the record. The upshot is that he did not believe that the stroke was caused by lupus or another auto-immune disorder. He noted several factors raising doubts about whether plaintiff had lupus or, if she did,

---

[3] The Mayo Clinic website defines lupus as follows: "Lupus is a chronic inflammatory disease that occurs when your body's immune system attacks your own tissues and organs. Inflammation caused by lupus can affect many different body systems—including your joints, skin, kidneys, blood cells, brain, heart and lungs. Lupus can be difficult to diagnose because its signs and symptoms often mimic those of other ailments. The most distinctive sign of lupus—a facial rash that resembles the wings of a butterfly unfolding across both cheeks—occurs in many but not all cases of lupus."

whether it was active. *See* R. 56 ("Serum complements were normal, indicating indeed if she had systemic lupus erythematosus, it was inactive at the time"). However, at the same time, he agreed that plaintiff "probably" had "some unidentified auto-immune disorder." R. 57. He stated that the best label would be a "connective tissue disorder."[4] R. 61. He noted that plaintiff's doctors were treating her "symptomatically as if she had lupus." *Id.* She was being given hydroxychloroquine, which he stated was used for any auto-immune disease and was not solely designed for lupus. R. 57. He further observed that hydroxychloroquine was "used for milder to moderate connective tissue disorder, whereas if it is moderate to serious, one needs to use much more stronger or potent medications, including—for short-term immediate use, high doses of steroids. For long-term use, immunosuppressive agents and biologicals such as Humira or Enbrel." R. 58. He concluded that plaintiff was receiving treatment at the "lowest level of disease activity." *Id.* Dr. Jilhewar agreed that there was enough evidence to conclude, at Step Two, that plaintiff's connective tissue disorder qualified as a severe impairment; however, he concluded that neither it, nor any of plaintiff's related conditions, would meet or equal a listing (more on this below). As for the residual functional capacity ("RFC") finding, he opined that plaintiff should be limited to sedentary work to account for the fatigue.

On January 6, 2015, the ALJ issued a decision finding plaintiff not disabled. The decision relies heavily on Dr. Jilhewar's analysis above, assigning his opinion "substantial weight." R. 31. In addition, the ALJ relied on other facts, including plaintiff's work history micro-braiding hair in 2011 and 2012 and her volunteer work of 12 to 13 hours a week in 2012. R. 22. The ALJ also relied on plaintiff's conservative and routine treatment, for example her refusal to see a specialist for her alleged lupus and her use of conservative medication for that condition. R. 26-27. As for

---

[4] The Mayo Clinic website provides the following definition: "Mixed connective tissue disease has signs and symptoms of a combination of disorders—primarily lupus, scleroderma and polymyositis. For this reason, mixed connective tissue disease is sometimes referred to as an overlap disease."

3

the stroke, the ALJ noted, among other things, that a Dr. Ramchandani, a consultative examiner, found "no stroke residuals by July 2007." R. 30.

In this appeal, plaintiff raises several arguments for remand. They are loosely grouped together under a single heading titled as follows: "The ALJ's Decision Was Not Supported by Substantial Evidence."[5] The Court discerns three lines of arguments, and will discuss them below. Although each of these arguments involves specific aspects, they all eventually loop back to the same fairly simple dispute. Everyone agrees plaintiff had some type of auto-immune condition capable of causing some level of fatigue. The question is how severe that fatigue was. Relying almost exclusively on her own testimony, plaintiff argues that the fatigue was severe and precluded any full-time work. Relying on the testimony of any impartial medical expert, the ALJ disagreed, finding that plaintiff could work a sedentary job.

**Argument # 1—Combined Effect.** Plaintiff argues that the ALJ failed to take into account the combined effect of her symptoms. However, this argument is vague and mostly consists of a re-litigation of the evidence relating to the main complaint of fatigue. For example, plaintiff notes that she was crying during several doctor visits and that there were "multiple references" in the record where she complained about fatigue. Dkt. #9 at 5-6. As plaintiff vaguely argues, this evidence was "consistent with an individual who generally does not feel well." *Id.* These points may be true, but there is no evidence that the ALJ did not consider them. In fact, plaintiff does not point to any line of evidence ignored by the ALJ. *Thomas v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (an ALJ may not ignore a line of evidence contrary to his conclusion). After reading the opinion, the Court cannot find any gaps in the ALJ's summary of the evidence. The ALJ summarized plaintiff's testimony in some detail, and often noted her complaints of fatigue. More generally, the ALJ explicitly and repeatedly stated that he had

---

[5] Plaintiff's opening brief is seven pages, and her reply is two and a half pages.

4

"considered all of [plaintiff's] impairments individually and in combination." R. 23; *see Richison v. Astrue*, 462 F. Appx. 622, 626 (7th Cir. 2012) (concluding that an ALJ who "wrote that he gave 'careful consideration' to 'the entire record' and 'considered all symptoms'" adequately considered the cumulative effects of the plaintiff's impairments in the absence of contrary evidence). Here, there is no evidence to cast doubt on the ALJ's assertion that he considered the combined effect of plaintiff's symptoms and impairments. Rather, plaintiff's arguments go to the weight of the evidence, as suggested by plaintiff's assertions that the ALJ allegedly failed to "fully" or "seriously" consider pieces of evidence.

Aside from the evidence relating to fatigue, plaintiff makes a few other assertions. Plaintiff periodically interjects the fact that she had a stroke. *See* Dkt. #9 at 5 ("This is an individual who experienced a stroke in 2006."). However, plaintiff fails to explain why this fact undermines the ALJ's decision. For one thing, whether one believes that the stroke was an independent *cause* of plaintiff's symptoms, plaintiff has not suggested that those symptoms were any different from the same ones also caused by the unspecified auto-immune disorder. Accordingly, the Court cannot see how additional focus on plaintiff's stroke would change the bottom line. In any event, contrary to plaintiff's suggestions, the ALJ explicitly discussed plaintiff's stroke and explained how doctors, such as Dr. Ramchandani, found no evidence of any residuals from that stroke. Yet, despite this consistent evidence that the stroke caused no discernible lingering effects, plaintiff continues in her two briefs to argue as if there were such evidence. *See, e.g.*, *id.* at 7 ("The records as a whole support an individual suffering from multiple conditions, including post-stroke residuals[.]"); *id.* ("the combined effects of Ms. Stewart's symptoms, including memory loss from the stroke residuals"). The fact that plaintiff

5

continues to rely these unsupported conjectures about residuals undermines her larger argument about the ALJ's supposed failure to consider the combined effect of her impairments.

Another undeveloped argument is plaintiff's assertion that she "continuously missed dosages of medicine, which she was aware could lead to a life-threatening blood clot." *Id.* at 5. Here again, plaintiff throws out an assertion that dangles without any supporting explanation or argument to hold it up. It is true that the ALJ, in the narrative summary, noted that plaintiff "often was noncompliant with taking prescribed Coumadin, a blood thinner." R. 27. But the ALJ did not place any great emphasis on this fact. In any event, the Court is not sure exactly why this fact strengthens plaintiff's case. Failure to take medication, even important medication, is a common occurrence in disability cases and could be caused by a myriad of factors. Here, the record is not clear about why plaintiff sometimes (though not all the time) failed to take her medication.[6] In sum, this argument does not provide a basis for remand.

**Argument # 2—Lack of a Rheumatological Examination.** Plaintiff asserts that the ALJ and Dr. Jilhewar of "improperly focused [on] the lack of a rheumatological evaluation and lack of substantiation of the lupus diagnosis with complete lab work up." *Id.* at 6. Plaintiff does not contest the factual predicates (*e.g.* that there was lack of substantiation), but argues that the ALJ "did not inquire as to whether there were cost issues that precluded Ms. Stewart form seeing a rheumatologist." *Id.* Plaintiff is alluding to the general principle that an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). The Government responds that the ALJ had no reason to inquire because there was "no

---

[6] Although not commented on by either side or by the ALJ, the Court notes that, at the first hearing, this issue was discussed. Plaintiff's counsel asked plaintiff whether she missed doses of Coumadin. She answered as follows: "I take it every day, because my doctor, she already—she always tells me, if I miss a dose, it's like life and death. I'm playing with my life. So, *I have not missed taking any medications*." R. 105 (emphasis added). Thus, plaintiff's answer contradicts the factual assertion in her brief.

6

record evidence indicating that [plaintiff] was unable to afford follow up with a rheumatologist." Dkt. #16 at 7. This point is true as stated by the Government, but it also should be noted that the issue of access was explicitly discussed in the following exchange:

> Plaintiff: [] I have a medical card. [].
>
> ALJ: [] So, that means if you have to go to the doctor, you can see a doctor. Yes?
>
> Plaintiff: Yes.

R. 89. At a later point during this hearing, plaintiff stated the following about whether she is able to go to the Crusader Clinic to get medical treatment: "Yes. I go—almost once a week I'm at the doctor's office." R. 96. This testimony undermines the speculations made now by plaintiff's counsel that cost was the reason plaintiff did not see a rheumatologist. Accordingly, the ALJ was entitled to rely on plaintiff's failure to see a specialist as one of several grounds for finding her not disabled.

**Argument # 3—Listings.** Plaintiff raises several arguments relating to the ALJ's listings analysis. In fact, this is where plaintiff rests her claim for being found disabled, as she does not challenge any specific portion of the ALJ's RFC finding at Step Four. The listings analysis at Step Three is meant to "streamline[] the decision process by identifying those claimants whose medical impairments are *so severe* that it is likely they would be found disabled regardless of their vocational background." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (emphasis added). At issue here is Listing 14.00, which covers various immune system disorders in adults. The ALJ and medical expert analyzed subsection 14.02, entitled "Systemic lupus erythematosus." Plaintiff complains that they *also* should have considered subsection 14.06, entitled "Undifferentiated and mixed connective tissue disease." However, as the Government persuasively argues in its response brief, "Listings 14.02 and 14.06 are identical *except* for the diagnosis." Dkt. #16 at 9. In

7

her reply brief, plaintiff does not respond to this argument, effectively conceding that there is no difference between the two sections such that any error would be harmless.

Plaintiff's better argument is that the ALJ and the medical expert did not properly or fully consider the requirements of these listings. They both contain two alternative tests. The first requires (among other things) a finding of a moderate level of severity of "two or more organs/body systems." Dr. Jilhewar concluded that plaintiff could not meet this test because there were not two organ systems involved. In her two briefs, plaintiff does not challenge this finding. Instead, she argues that she could qualify under the second test, which requires "repeated manifestations" of lupus (or connective tissue disorder) with "[a]t least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:  1.  Limitation of activities of daily living.  2. Limitation in maintaining social functioning.  3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace."  Plaintiff argues that the ALJ's explanation for why she could not meet this test was perfunctory. In arguing that she could meet this test, plaintiff again focuses on her ongoing complaints of fatigue and argues that these reports show that she had both "severe fatigue" and "malaise," thus meeting two of the constitutional signs and symptoms listed above. However, as explained above, Dr. Jilhewar disagreed with the conclusion that plaintiff's fatigue rose to the severe level needed to meet these requirements based on, among other things, the lack of objective medical reports and inconsistent treatment. The Court cannot find that this analysis was insufficient. It is true that Dr. Jilhewar did not offer a detailed explanation of the definition of fatigue. But plaintiff has not offered any authority on how to interpret these vague terms. Dr. Jilhewar is a medical expert, who is also familiar with Social Security regulations, as the ALJ recognized. Listing 14.00

provides the following definition of "severe" used in this listing: "*Severe* means medical severity as used by the medical community. The term does not have the same meaning as it does when we use it in connection with a finding at the second step of the sequential evaluation process[.]" Plaintiff has offered no basis for questioning Dr. Jilhewar's medical judgment that plaintiff's fatigue did not constitute "severe fatigue" or "malaise" as defined by the medical community. For these reasons, the Court finds that the listing analysis was sufficient.

\* \* \*

In sum, the Court finds that the ALJ relied on substantial evidence, discussed the relevant lines of evidence, acknowledged counter-evidence when appropriate, and explained the general path of his reasoning. The Court recognizes that plaintiff believes this same evidence should lead to a different conclusion (*i.e.* that plaintiff was disabled), but the Court finds that plaintiff's arguments ultimately boil down to requests for this Court to "reweigh [the] evidence" and then "substitute [its] judgement for the ALJ's." *Alvarado v. Colvin*, 836 F. 3d 744, 747 (7th Cir. 2016). This is not a role this Court is permitted to play. Another way to view this result is to note that the "[t]he burden of proof is on the claimant through step four." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000); 20 C.F.R. § 416.912 ("In general, you have to prove to us that you are blind or disabled."). Plaintiff has not offered any medical opinion supporting her theory of the case. Unlike many cases in which there are multiple conflicting opinions, in this case, there is only one opinion (Dr. Jilhewar's testimony) addressing the core issue. If the ALJ were to rule in plaintiff's favor, the ALJ would have to reject Dr. Jilhewar's opinion based on the ALJ's layperson analysis. If the roles were reversed and the shoe were on the other foot, plaintiff undoubtedly would reject such a conclusion as being improper "doctor playing."

9

For all the above reasons, plaintiff's motion for summary judgment is denied, the Government's motion is granted, and the ALJ's decision is affirmed.

Date: September 28, 2017    By: _____
                                Iain D. Johnston
                                United States Magistrate Judge